```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
BOARD OF TRUSTEES OF 1199/SEIU GREATER    :
NEW YORK BENEFIT FUND and BOARD OF        :
TRUSTEES OF 1199/SEIU GREATER NEW YORK    :   20cv6932 (DLC)
EDUCATION FUND,                           :
                                          :
                     Plaintiffs,          :   OPINION AND ORDER
                                          :
              -v-                         :
                                          :
AMBOY CARE CENTER, INC.,                  :
                                          :
                     Defendant.           :
                                          :
---------------------------------------- X
```

APPEARANCES:

For plaintiffs Board of Trustees of 1199/SEIU Greater New York
Benefit Fund and Board of Trustees of 1199/SEIU Greater New York
Education Fund:
Patricia McConnell
Levy Ratner, PC
80 8th Avenue, Ste 8th Floor
New York, NY 10011

For defendant Amboy Care Center, Inc.:
David F. Jasinski
Jasinski, P.C.
2 Hance Avenue, 3rd Floor
Tinton Falls, NJ 07724

DENISE COTE, District Judge:

The Boards of Trustees of 1199/SEIU Greater New York Benefit Fund ("Benefit Fund") and Education Fund ("Education Fund," together, the "Funds"), have sued Amboy Care Center, Inc. ("Amboy"), a nursing home employer in Perth Amboy, New Jersey, for contributions to the Funds. The Funds allege that Amboy

failed to pay contributions for the period January 1, 2015 through December 31, 2018, according to the terms of a series of collective bargaining agreements with 1199/SEIU United Healthcare Workers East (the "CBA").  Through their April 15, 2022 motion for summary judgment, the Funds seek $357,347.89 for the Benefit Fund and $10,669.95 for the Education Fund, plus interest, costs, and attorneys' fees.  The motion became fully submitted on June 10.  For the following reasons, the motion is granted in part.

## Background

The following facts are taken in the light most favorable to the defendant.  This action arises from the alleged nonpayment of health and education benefits to a bargaining unit of employees represented by 1199/SEIU United Healthcare Workers East (the "Union").

On July 6, 2005, the Union executed the CBA with Amboy, who is defined as the "Employer."  With renewals, the CBA was extended to June 30, 2020.  Pursuant to Article 36 of the CBA, Amboy agreed to make contributions to the Benefit Fund "for each eligible employee covered by this Agreement at the rate of 22.33% of gross payroll of all bargaining unit employees who have completed one hundred twenty (120) days of employment or more and regularly work more than twenty-two and one-half (22

1/2) hours per week." That Article explains that "'[g]ross payroll' for the purpose of [the Benefit Fund] provision shall exclude . . . wages of employees who opt out of the health insurance coverage or are no frills." Amendments to the CBA increased the rate of contributions for the Benefit Fund to 34.5% of the gross payroll by January 1, 2017.

As explained in Article 36, the term gross payroll excludes the wages of two classes of Union employees from Benefit Fund contribution calculations. Those two classes are known as the Opt-Out and the No Frills employees. The Opt-Out employees are defined in Article 36.7 as those employees who voluntarily elect not to receive health insurance upon written proof of other coverage.

The Article addressing "No Frills" employees, Article 15, is entitled "Per Diem/No Frills and Temporary Employees." It requires Amboy to schedule the work hours of No Frills employees after it sets the schedule for its full and part-time employees and explains that Amboy does not have to make either pension fund or health benefit contributions for No Frills employees. No Frills employees are "paid a differential of one dollar ($1.00) above their regular rate of pay for all hours paid."

The CBA caps the number of No Frills employee hours that Amboy may utilize per year at a percentage of all bargaining unit employees.  Article 15.3 provides:

> The Employer shall reduce the utilization of Per diem/no frills or temporary (including Agency) employees by a cumulative amount of five percent (5%) by January 1, 2006 of bargaining unit employees (reduce from 66% to 61% of the bargaining unit employees), and an additional reduction of six percent (6%) by July 1, 2006 and continuing reductions pursuant to the following schedule:  By January 1, 2007 -- five percent (5%); By July 1, 2007 -- six percent (6%); and by January 1, 2008 -- five percent (5%).

This percentage, or "allowance," decreased every year until it reached 39% by January 1, 2008.  When Amboy agreed to amend the CBA in 2012, it again agreed to cap its utilization of No Frills employees to no greater than 39% of bargaining unit employees.

Article 38[1] of the CBA set a contribution rate for the Education Fund at 0.5% of gross payroll.  Article 38.2 of the CBA provides that with respect to the Education Fund, "[c]alculations of gross payroll shall be based on the same formula (inclusions/exclusions) utilized to calculate Employer contributions to the [Benefit Fund]."

The CBA required Amboy to submit reports on all employees, including No Frills employees.  Article 15.5 of the CBA requires the Employer to "supply to the Union and Funds on a quarterly

---

[1] Article 38 of the CBA was renumbered to Article 37 in a 2008 Memorandum of Agreement ("MOA") amending and extending the CBA.

4

basis a report showing the date and shift in which each Per Diem/no frills employee" worked.  Article 36.4 requires monthly statements of covered employees' wages and provides that each Employer "agree[s] to make available for inspection to the Trustees of the [Benefit] Fund all payroll records that may be required for the sound and efficient operation of the Fund."

The Trustees of the Funds are authorized through two Trust Agreements to recover delinquent contributions due under the CBA.  The Trustees are "empowered to seek all damages, including, but not limited to, liquidated damages, interest at such rate the Trustees shall from time to time determine, and the costs and legal fees incurred."  The Benefit Fund Trust Agreement was adopted in 1958 and was most recently amended and restated as of July 14, 2011.  The Education Fund Trust Agreement became effective in 1994 and was most recently amended and restated as of June 23, 2015.  The Benefit Fund Trust Agreement provides that when an audit report indicates a "deficiency or delinquency, the Employer shall pay such deficient or delinquent amount . . . with interest at the rate of twelve (12%) per annum."[2]

---

[2] A 12% interest rate for unpaid contributions is not stated in the excerpts of the Education Fund Trust Agreement provided with this motion.  Amboy does not oppose this plan rate of interest for either Fund.

In November 2018, the Funds began an audit of Amboy's payroll records for the period January 1, 2015 through December 31, 2018.  On March 20, 2019, the Funds sent Amboy an audit report that assessed unpaid contributions in the amounts of $994,779.52 owed to the Benefit Fund and $14,913.42 owed to the Education Fund, plus costs and interest.  Responding to Amboy's objections, the Funds sent a revised audit report to Amboy on September 13, 2019.  The revised report demanded unpaid contributions in the amounts of $357,347.89 to the Benefit Fund and $10,669.95 to the Education Fund, plus $500 in audit costs and $84,270.08 in accrued interest based on a 12% interest rate.

The audit concluded that Amboy had failed to make adequate contributions because Amboy had reported none of the wages of its No Frills employees.  In calculating the benefits owed, the audit excluded the wages for No Frills employees up to 39% of the gross No Frills payroll figure of $2.1 million.[3]  The report additionally showed that one No Frills employee whose inclusion had been challenged by Amboy had earned $49,361.64 between 2016 and 2018.  This constituted 4.7% of the No Frills employee wage-hours exceeding 39% of the gross payroll, which was $1,047,532.15.

---

[3] The audit calculated the total gross payroll figure as roughly $2.8 million.

6

Amboy did not pay the demanded sums. The Funds commenced this action on August 27, 2020, alleging that, by failing to pay contributions owed to the Benefit and Education Funds pursuant to its CBA with the Union, Amboy violated the terms of the CBA, § 515 of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1145, and § 301 of the of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 185.

On July 29, 2021, Amboy moved pursuant to Rule 12(b)(1), Fed. R. Civ. P., to dismiss the complaint and compel arbitration on the ground that the CBA limits the Funds' remedy to arbitration. The motion was denied in an Order of October 21, which incorporated by reference an Opinion of the same date in a related case. See Bd. of Trustees of 1199/SEIU Greater New York Benefit Fund v. Manhattanview Nursing Home, No. 20CV6936 (DLC), 2021 WL 4942768 (S.D.N.Y. Oct. 22, 2021); Bd. of Trustees of 1199/SEIU Greater New York Benefit Fund v. Amboy Care Center, Inc., No. 20CV6936 (DLC), Order of October 22, 2021.

## Discussion

The Funds seek summary judgment on two claims for the payment of alleged delinquent contributions owed to the Benefit and Education Funds. They seek to recover unpaid contributions pursuant to the findings of the revised audit report, plus

7

statutory double interest, attorney's fees and costs, and the cost of the audit pursuant to § 502(g)(2) of ERISA.

Summary judgment may only be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted). In considering a motion for summary judgment, a court "construe[s] the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citation omitted).

I.  ERISA Liability

Section 515 of ERISA covers delinquent contributions[4] to plans made under "the terms of a collectively bargained agreement" and requires that

> [e]very employer who is obligated to make contributions to a multi-employer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with the law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145.  In other words, to be "liable for delinquent contributions under Section 515 of ERISA, a defendant must (1) have contribution obligations that arise from either a 'plan' or a 'collectively bargained agreement' and (2) be an 'employer' within the meaning of ERISA."  Div. 1181 Amalgamated Transit Union-New York Emps. Pension Fund v. New York City Dep't of Educ., 9 F.4th 91, 94 (2d Cir. 2021) (quoting 29 U.S.C. § 1145).

Section 502 of ERISA grants the trustees of a covered fund the right to bring an action in federal court to enforce § 515. See 29 U.S.C. § 1132.  In any such action, § 502(g)(2) of ERISA authorizes district courts to award unpaid contributions, the interest on unpaid contributions, the greater of doubled interest or liquidated damages, and attorneys' fees.  Id. §

---

[4] Section 515 of ERISA uses the term "delinquent contributions," and § 502 refers to "unpaid contributions."  29 U.S.C. §§ 1132(g)(2), 1145.  This Opinion uses the terms interchangeably.

1132(g)(2).  The Supreme Court has observed that these "strict remedies" were enacted "to give employers a strong incentive to honor their contractual obligations to contribute and to facilitate the collection of delinquent accounts."  Laborers Health & Welfare Tr. Fund For N. California v. Advanced Lightweight Concrete Co., 484 U.S. 539, 547 (1988) ("Laborers Health").

"[C]ollective-bargaining agreements and ERISA plan documents must be interpreted according to ordinary principles of contract law."  32BJ N. Pension Fund v. Nutrition Mgmt. Servs. Co., 935 F.3d 93, 99 (2d Cir. 2019) ("32BJ") (citation omitted).  Because "ERISA plans are construed according to federal common law," contract interpretation is "largely informed by state law principles."  Massaro v. Palladino, 19 F.4th 197, 210 (2d Cir. 2021) (citation omitted).  Courts therefore "review an ERISA plan as a whole, giving terms their plain meanings."  Id. (citation omitted).

"Where the parties dispute the meaning of particular contract clauses, the task of the court is to determine whether such clauses are ambiguous when read in the context of the entire agreement."  32BJ, 935 F.3d at 100 (citation omitted). "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent

10

person." Aramony v. United Way of Am., 254 F.3d 403, 412 (2d Cir. 2001) (citation omitted). In determining whether language in an ERISA plan is ambiguous, "reference may not be had to matters external to the entire integrated agreement." Id. (citation omitted). Courts will not read additional terms into an unambiguous ERISA plan. Connors v. Connecticut Gen. Life Ins. Co., 272 F.3d 127, 137 (2d Cir. 2001). Similarly, an ERISA plan may not be interpreted to "render some provisions of the plan superfluous." Frommert v. Conkright, 738 F.3d 522, 530 (2d Cir. 2013) (citation omitted).

The resolution of this dispute largely turns on the construction of Articles 15 and 36 of the CBA. These terms, when read together, unambiguously require Amboy to contribute to the Benefit Fund based on the calculation of gross payroll, which includes the wages of No Frills employees that exceed the 39% cap. The definition of gross payroll in Article 36 excludes No Frills employees, and Article 15 limits the number of No Frills employees that Amboy could hire during the relevant period to 39% of bargaining unit employees. Therefore, the CBA unambiguously provides that Amboy could not exclude from gross payroll the wages of No Frill employees it hired in excess of the cap of 39%.

Amboy has submitted no evidence that contradicts the conclusion of the revised audit report that Amboy failed to report the payroll for its No Frill employees and that it consequently owes unpaid contributions to the Funds to the extent that payroll exceeded the 39% cap.  Amboy argues that making contributions for the payroll of No Frills employees exceeding the 39% cap imposes an uncontracted-for penalty found nowhere in the CBA.  Amboy cannot escape its contractual obligation under the CBA by recharacterizing the Trustees' pursuit of the Funds' legal rights as punitive.  The plain terms of the CBA cap the number of No Frills employees Amboy was permitted to exclude for the gross payroll calculation against which its rate of contributions is applied.

Amboy next argues that none of the No Frills employees received health insurance coverage from the Benefit Fund in exchange for its contributions to the Fund.  This argument fails.  Neither the CBA nor ERISA requires that employer contributions to a multi-employer benefit plan directly correspond to the number of employees receiving health insurance coverage and fringe benefits pursuant to a plan.  To the extent that Amboy contends that it is not liable because the amount demanded is disproportionate to the benefits provided, it misunderstands the purpose of the remedies provided in §§ 515

and 502 of ERISA.  See Laborers Health, 484 U.S. at 547.  ERISA seeks to ensure the regular and timely payment of employer contributions.  That goal is achieved through the enforcement of the CBA to which Amboy agreed to be bound.

Amboy finally argues that the revised audit report's calculations are unreliable because the auditor admitted to errors in the initial audit report and twice recalculated contributions owed to the Benefit Fund.  After the Funds sent Amboy the initial audit report in March 2019, Amboy raised three objections to the inclusion of the wage-hours of two Opt-Out employees and one No Frills employee in the calculation of gross payroll.  The Funds' revised audit report of August 2019 accepted Amboy's objections to the Opt-Out employees but rejected its objection to the No Frills employee's wage-hours.  Amboy did not further contest the issue.  This sequence of events, and the auditor's willingness to admit error and make corrections, does not render the detailed calculations in the revised audit report so unreliable as to create a genuine dispute over the fact that Amboy owes the contributions identified in that revised report.  Amboy has at any rate failed to produce evidence that disputes specific line items of the revised audit report.

II. Damages

Having shown that Amboy is liable for unpaid contributions pursuant to § 515 of ERISA, the Trustees are entitled to recover damages on behalf of the Funds pursuant to § 502(g)(2), which provides that

> [i]n any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section [515 of ERISA] in which a judgment in favor of the plan is awarded, the court shall award the plan --
>
> (A)  the unpaid contributions,
>
> (B)  interest on the unpaid contributions,
>
> (C)  an amount equal to the greater of -- (i) interest on the unpaid contributions, or (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),
>
> (D)  reasonable attorney's fees and costs of the action, to be paid by the defendant, and
>
> (E)  such other legal or equitable relief as the court deems appropriate.

29 U.S.C. 1132(g)(2).

The amount of damages must be calculated with "reasonable certainty." Cement & Concrete Workers Dist. Council Welfare Fund, Pension Fund, Annuity Fund, Educ. & Training Fund & Other Funds v. Metro Found. Contractors Inc., 699 F.3d 230, 235 (2d Cir. 2012) ("Cement & Concrete") (citation omitted). "There must be an evidentiary basis for the damages sought by

plaintiff, and a district court may determine there is sufficient evidence either based upon evidence presented at a hearing or upon a review of detailed affidavits and documentary evidence." Id. at 234. "[I]nterest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of title 26." 29 U.S.C. § 1132(g)(2). For purposes of § 502(g)(2), "the plan" may be "the trust agreement or contract under which the plan was formed." 32BJ, 935 F.3d at 99 (citation omitted).

    A.    The Benefit Fund

The Funds are entitled to damages in the sum of $357,347.89 in unpaid contributions owed to the Benefit Fund. The revised report is detailed and reliable with respect to its calculations of the sum of unpaid contributions owed to the Benefit Fund. The report is supported by the affidavit of the auditor and details the wages and hours of each No Frills employee based on Amboy's payroll records, and the unpaid Benefit Fund contributions are calculated in accordance with the criteria set out in the CBA.

    B.    The Education Fund

The Trustees seek the sum of $10,669.95 in unpaid contributions owed to the Education Fund. This figure is not adequately supported by the terms of the CBA.

15

Article 38.2 of the CBA requires that gross payroll for the Education Fund conform to the formula, including inclusions and exclusions, provided for the Benefit Fund.  The revised audit report derived the sum of $10,669.95 by taking 0.5% of the full amount of unreported No Frills wages in each year of the audit period.  In other words, this sum was not calculated by multiplying 0.5% with only those No Frills wages in excess of the 39% CBA allowance, as was done to calculate unpaid contributions owed to the Benefit Fund.  Accordingly, the Funds have only shown that, at most, the sum of unpaid contributions due to the Education Fund is $5,237.66.[5]  Summary judgment for unpaid contributions due to the Education Fund is therefore granted only in this amount.

## Conclusion

The plaintiffs' motion for summary judgment is granted in part.  The Benefit Fund is awarded judgment for unpaid contributions in the amount of $357,347.89, and the Education

---

[5] This amount was calculated by multiplying the 0.5% of gross payroll contribution rate due to the Education Fund with each year's gross payroll -- roughly $2.8 million -- minus Opt-Outs and the No Frills allowance of 39% of gross payroll -- roughly $1.1 million -- according to figures found in the revised audit report.  The results were $1,297.91 owed in 2015; $727.44 owed in 2016; $824.34 owed in 2017; and $2,387.98 owed in 2018.  Added together, the total unpaid contributions owed by Amboy to the Education Fund amounts to $5,237.66.

Fund is awarded judgment for unpaid contributions in the amount of $5,237.66. Both Funds are each awarded judgment for $500 in audit costs and interest accruing at a 24% annual rate from December 31, 2018. A separate Order will set a schedule for submissions of interest rate calculations and a motion for attorneys' fees.

Dated:     New York, New York
           June 27, 2022

                                        _____
                                        DENISE COTE
                                        United States District Judge